GI M. MALALA for himself and on behalf of the GI FAMILY of Pago Pago, Plaintiff

v.

LEAIA TEMU and SOLEMA TEMU, Defendants

High Court of American Samoa
Land and Titles Division

LT No. 22-88

June 27, 1989

Before REES, Associate Justice, AFUOLA, Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, Edwin Gurr
         For Defendants, Asaua Fuimaono

This is an action for eviction. Plaintiff is the sa'o of the Gi family. Defendants are non-members of the Gi family who are residing in a house on Gi family land.

The house was built in 1968 by Peleifofoga Temu, a blood member of the Gi family. Pele obtained a separation agreement and a Development Bank loan for the house. The Gi title was then

vacant and the separation agreement was signed by a number of family members in lieu of a sa'o. Pele subsequently passed away and his widow, Fale Temu, lived in the house and made payments on the Development Bank loan until about 1984. After Fale had moved away the present defendants moved into the house.

Defendant Leaia Temu is the mother of the deceased Pele Temu. Leaia's daughter, defendant Solema Temu, is Pele's half sister. Although neither is a blood member of the Gi family[1] (Pele having been a member of the family through his father) they went on the land in 1985 with the support of at least some members of the family.

On November 4, 1985, a family member called Lotoa Gi Onosa'i purported to execute on behalf of the family a second separation agreement for Pele's house. This agreement was in favor of defendant Leaia. It was superfluous and probably illegal: in the first place, the Gi title was not then vacant, although the incumbent sa'o was living off island; and in any case the house, which in accordance with the earlier agreement was the personal property of Pele, had presumably passed upon his death to his surviving wife and children. See A.S.C.A. § 40.0103, 40.0201.

On August 20, 1986, Fale Temu signed a document purporting to convey the house to Leaia in exchange for Leaia's agreement to pay the balance of $6284.79 on the Development Bank loan. Leaia has since made a number of payments on the loan.

On August 31, 1986, the then incumbent Gi titleholder renounced his title in favor of Moe Malala. Gi Moe Malala then registered the title, apparently with the support of an overwhelming consensus of the family. There was in any case no formal objection to the registration, which became official on November 6, 1986.

---

[1] [At a hearing held August 22, 1989, on defendants' motion for relief from the judgment under T.C.R.C.P. Rule 60(b), the Court held that this finding of fact was partly incorrect. Defendant Solema Temu is a blood member of the Gi family. The Court denied the motion for relief from judgement on other grounds and did not reverse those parts of this opinion which apply to expulsion of family members from family land. See Gi v. Temu, 12 A.S.R.2d ___, LT No. 22-88, Opinion and Order on Motion for Relief From Judgment, issued August 24, 1989.]

Leaia and Solema rendered service to Gi Malala and lived peacefully with the Gi family for a year or two. A difference then arose with some Gi family members who lived in a neighboring house. The difference concerned some crops that Leaia, Solema, and some of their respective children had planted in an area between their house and that of their neighbors. Gi Malala ordered Leaia and Solema to remove their crops. They refused to do so, and eventually built a small sleeping house in the disputed area. The sleeping house was occupied by teenage boys and seems to have been regarded by both sides as a sort of frontier post.

One day early in 1988 Gi went to remonstrate with Solema about the crops and the house. She went into her house and got a bush knife which she brandished at him. That night Solema and Leaia invited some Tongan friends onto the Gi property. The friends had guns, with which they spent the evening shooting fruit bats.

Gi made at least one attempt to settle the dispute peacefully, calling together some older members of the family including two who had been among Leaia's closest allies in her dispute with her neighbors. Gi suggested that the only solution was to expel the two non-family members from family land; he relented, however, when a distinguished talking chief of the family got down on his knees to apologize for the conduct of Leaia and Solema. Gi then agreed that the two could remain if the house and crops were removed. This was not done.

On June 11, 1988, Gi ordered Leaia and those residing with her to vacate the house in which they were living. They ignored this demand, which eventually led to the present action.

At the conclusion of the trial the Court observed that controversies such as this one are better settled within the family than in court. The Court urged defendants and those family members who took their side in the controversy to go to the sa'o and to apologize, to destroy the offending structure, and to cause no further dissension. The Court urged Gi to find it in his heart to accept such an apology. The record was left open for a period of thirty days for a report by the parties on the results of any such efforts at settlement.

When two months had gone by with no word from the parties, the Court issued a memorandum to counsel requesting a report on efforts at settlement. Counsel for plaintiff filed a letter from his client, the sa'o, to the effect that the sleeping house had been removed but that there had been no apology and that defendants had continued their quarrel with the neighboring family members and even cleared new areas within the disputed land. Counsel for defendant has filed no response to the Court's memorandum.

Without making any finding with regard to the truth of the allegations in the report filed by Gi, we conclude that there has been no settlement and that the Court must render its decision.

Defendants advance two principal arguments against Gi's right to evict them. First, they suggest that the land may not belong to Gi at all. Lotoa Gi Onosa'i testified that the land really belonged to another family; that her late father, Gi Onosa'i, effectively appropriated the land for the Gi family; and that before he died he conveyed sole authority over the land to her. This argument is inconsistent not only with the testimony of every other witness, but also with Lotoa's own affirmation in the 1968 and 1985 separation agreements that the land belonged to the Gi family. A unilateral and apparently secret attempt by Gi Onosa'i to give his daughter sole authority over family land to the exclusion of his successors in the Gi title would seem to have been inconsistent with Samoan tradition, and would certainly have been contrary to the statutory law of American Samoa with regard to alienation of family land. See A.S.C.A. §§ 37.0201 et seq. The idea seems to have been an afterthought by Lotoa, whose testimony makes it clear that she regards herself rather than Gi Malala as the principal authority in the family. She is wrong on both counts.

The defendants also contend that Gi cannot expel them from family land without further consultation within the family, and that such consultation must include consultation with themselves personally. We reject this contention.

It is true that a matai should ordinarily consult with the family, including especially those family members directly affected, before taking land assigned to a family member in order to use

141

the land for some other family purpose. <u>Talili v. Satele</u>, 4 A.S.R.2d 23 (1987); <u>cf.</u> <u>Fairholt v. Aulava</u>, 1 A.S.R.2d 73 (1983). Nor can a matai seize on minor disagreements as a pretext for the expulsion of family members who have otherwise rendered long and loyal service. <u>Tago v. Faleulu</u>, 3 A.S.R. 370 (1958). But these exceptions prove the general rule that a sa'o has the authority to make decisions about family land. "Ordinarily an assignment of land . . . by the matai to a family member is for the latter's lifetime, and it cannot be revoked and the family member deprived of its possession, <u>except for good cause.</u>" <u>Taesali v. Samuela</u>, 3 A.S.R. 359, 361 (1958) (emphasis added). "[W]ith respect to the termination of occupancy rights . . . only the matai would have this power." <u>Malaga v. Alaga</u>, 4 A.S.R. 735, 738 (1966). Courts will not interfere with the decisions of a sa'o unless they are arbitrary, capricious, illegal, or abusive of discretion. <u>See</u> <u>Fairholt</u>, <u>supra</u>.

In the present case Gi attempted to solve a dispute between two groups of people living on his land. There is no evidence that he was motivated other than by a desire to perform his principal duty as the sa'o, the preservation of peace within the family. The defendants responded by ignoring and disobeying his legitimate directives, threatening him with a knife, and sponsoring a shooting party. Under the circumstances we cannot say that the order of expulsion was without good cause, illegal, arbitrary, capricious, or abusive of discretion.

Our conclusion is bolstered by the evidence that Gi did consult with a number of family members on at least one occasion. Contrary to defendants' suggestion, the obligation of a sa'o to discuss family decisions with family members cannot be reduced to a formula. <u>See</u> <u>Tiumalu v. Scanlan</u>, 4 A.S.R. 194 (1961); <u>Haleck v. Tiumalu</u>, 3 A.S.R. 380 (1959). In this case the sa'o acted reasonably.

Finally, we note that the defendants are <u>not</u> blood members of the family. Although we decline to hold that persons living within a family who are not blood members can always be expelled at the whim of the sa'o, it is axiomatic that non-members do not enjoy the benefit of the strong presumption that a family member may live on family land.

"[U]nder Samoan customs (faa-Samoa) . . . communal family land is owned by the Samoan family as such and each member of the family has a right to the use of a portion of the family land." This right to use family land has also been held to be a proprietary right within the due process clause . . . . [A] family member has such a proprietary right to use family land whereas [a non-family member] by definition has no such right.

Lutu v. Taesaliali'i, LT No. 20-88, 11 A.S.R.86, 94 (1989), quoting Tuanaitau v. Paogofie, 4 A.S.R. 375, 381 (1963). See also, e.g., Mageo v. Viena, 1 A.S.R.2d 83 (1983); Fa'amuli v. Leiato, 3 A.S.R. 308 (1957); Lam Yuen v. Leomiti, LT 3-87. The behavior of the present defendants would have constituted good cause for the expulsion of a family member; a fortiori, it was sufficient to justify Gi's decision to expel these two non-family members.

The situation is complicated, however, by the separate ownership of the house. Since Fale Temu had no power to convey any interest owned by the surviving children of Pele, it would appear that the house now belongs partly to these children and partly to Leaia. The children of Pele, who are Gi family members and who have not been shown to have done anything meriting expulsion from family land, have the right to live in the house so long as they render service to Gi and respect his authority. Leaia may have a right to compensation from the children of Pele for her interest in the house. If no children of Pele wish to occupy the house--- and assuming that it is still not possible for the parties to reach a settlement whereby the defendants sincerely apologize to Gi and Gi agrees to let the defendants live in the house so long as they respect his authority --- the best solution might be for the Gi family to purchase the house from its owners. Since no children of Pele are parties to this action, however, these questions do not presently admit of judicial resolution.

Judgment will issue for the plaintiff ordering eviction of the defendants from the land Utumoa and enjoining them from entering upon the land. Execution of the judgment will be stayed for thirty days. Unless plaintiff agrees otherwise, defendants must vacate the land by July 27, 1989.

It is so ordered.

